[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 1, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-15604
Non-Argument Calendar

_____

BIA No. A96-017-506

XHEVAT GASHI,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(August 1, 2008)**

Before BARKETT, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Xhevat Gashi, a native and citizen of Kosovo, seeks review of the BIA's denial of his motion to reopen his removal proceedings based on new evidence and changed country conditions, pursuant to 8 C.F.R. § 1003.2(c), and refusal to exercise its discretion to sua sponte reopen the proceedings, pursuant to 8 C.F.R. § 1003.2(a). Gashi also challenges the BIA's denial of asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and denial of relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), INA §§ 208, 241, 8 U.S.C. §§ 1158, 1231, 8 C.F.R. § 208.16(c). For the reasons discussed below, we deny the petition in part and dismiss the petition in part.

## I. Facts

### a. Application for Asylum, Withholding of Removal, and CAT relief

Gashi filed an application for asylum, withholding of removal, and CAT relief, claiming that he had been or would be persecuted or tortured on account of his religion, nationality, political opinion, and membership in a particular social group. Specifically, Gashi indicated that he was an ethnic Albanian and practiced Islam. He had been active in the Democratic League of Kosovo ("LDK") since 1990. Because of this political activity, he and his family had been persecuted by Serbian police and members of the extremist Albanian Democratic Party ("extremist Democratic Party"), as follows.

2

On May 24, 1992, the day of general elections in Kosovo, Gashi was arrested and detained at a police station for two weeks by Serbian police. In early December 1997, during a demonstration on behalf of opening Albanian-language schools, Gashi was arrested and detained at a police station for four to five days by Serbian police. In March 1998, Gashi's house was searched, and he was arrested and detained at a police station for one week by Serbian police. During each of these detentions, Serbian police beat Gashi, threatened his life, and warned him to cease his political activity.

Then, on April 13, 1999, Serbian forces ordered Gashi and his family and others to leave their village. When Gashi's father argued, Serbian police murdered him. Because of this, Gashi's family fled to Albania. When they returned to Kosovo in June 1999, they discovered that Gashi's father's body had been left outside to rot and that Gashi's family's house had been "almost destroyed."

Later, on October 14, 2002, Gashi was abducted by six members of the extremist Democratic Party and taken to a house, where he was held and beaten for ten hours and ordered to cease his political activity. Because of this, Gashi decided to flee Kosovo for the United States.

After his arrival here, his father's cousin, a leader in the LDK, was murdered in January 2003 by members of the Democratic Party. Gashi feared that the same would befall him if he returned to Kosovo.

3

Along with his application, Gashi filed, <u>inter alia</u>: (1) his LDK membership card, which included a photograph; (2) a letter from his wife, stating that Gashi had been arrested many times by Serbian police because of his political activity, that her father-in-law was murdered by Serbian forces on April 13, 1999, that Gashi was abducted by extremist Democratic Party members, and that she and their children continued to be threatened after Gashi fled to the United States; and (3) a sworn statement made by Gashi on or about the day of his arrival in the United States, containing Gashi's initialed signature on each page and indicating that he felt he had no choice but to enter the United States because "[s]omeone [was] terrorizing [his] family, and [he didn't] know who."

At his asylum hearing, Gashi testified that his sworn statement was given via telephone. An immigration officer asked him questions though an interpreter. Gashi did not always understand the interpreter, such that his answers to the questions were sometimes inaccurate. Also, the interpreter did not read the answers back to Gashi before instructing Gashi to sign the statement, such that Gashi's signature did not mean that he approved the inaccurate answers. His LDK-membership-card photo was made in 1990.

On March 14, 1992, on general election day, he and others were arrested by Serbian police and imprisoned, although never charged. After his imprisonment, he needed medical treatment. Because no hospital would admit him, since he was

not Serbian, a doctor came to his home. He did not submit medical records of this treatment, however, because all of his important papers were destroyed during the war and the treating doctor moved to another town. During Gashi's testimony at the hearing, at the prompting of his attorney, Gashi testified that he actually was arrested on May 24, 1992. On March 14, 1997, at a demonstration, he was arrested by Serbian police and held, although never charged. Again at the prompting of his attorney, Gashi testified that this actually occurred on December 24, 1998. He then stated that he was very emotional and that the incident actually occurred on December 24, 1997. On March 14, 1998, Serbian police came to his home, searched the home for LDK papers and weapons, and arrested Gashi and held him for four to five days.

Then, on April 13, 1999, during the war, Gashi's family and others were gathered in his home, seeking shelter from the gunfire outside, when Serbian forces broke in and tried to force everyone onto the street. When Gashi's father protested, he was shot. When Gashi's mother went back for his father, she too was shot. After this, Gashi's family fled to Albania.

After he returned, Gashi had no major problems with the Serbs. Sometimes, when he rode buses, Serbian police would stop and search the bus, kicking and pushing around its passengers. Also, sometimes when he held LDK meetings, political opponents would shoot guns into the air outside. His major problems

5

now, however, were with members of the extremist Democratic Party.  On October 14, 2002, six extremist Democratic Party members abducted him and held him in a house for ten hours, beating him and threatening him with knives and attempting to force him to work for their party.

Since he left Kosovo, people had called and threatened his wife, and have stopped his children and asked them the whereabouts of their father.  Although the LDK had been in power since 2001, he could not return to Kosovo because he now will be persecuted for leaving Kosovo.

The IJ denied Gashi's application, reasoning that Gashi had not provided credible testimony demonstrating asylum, withholding-of-removal, or CAT-relief eligibility.  The IJ specifically noted that, inter alia: (1) while Gashi stated that his LDK-membership-card photo was made in 1990, the photo reflected his current appearance; (2) although Gashi initially testified that the first incident occurred on March 14, 1992, he later changed his testimony to May 24, 1992, which was inconsistent with his asylum application; (3) Gashi also could not get the date of the second incident correct; (4) Gashi testified that he was detained in March 1998 for four to five days, but stated in his application that the detention lasted one week; (5) Gashi did not mention in his application that his mother also was killed, and his wife's letter mentioned nothing of this other murder; (6) Gashi did not provide any death certificates for his parents; (7) Gashi did not describe the bus-

stopping and gun-shooting incidents in his application; (8) in his sworn statement, Gashi indicated that he had a fear of returning to Kosovo because people who he could not identify were persecuting him, rather than that Serbians and political opponents were persecuting him because of his political activity.

Gashi appealed the IJ's decision to the BIA. The BIA adopted and affirmed the IJ'S decision on November 15, 2005. The BIA agreed with the IJ that Gashi had failed to show that the contents of the sworn statement were unreliable, as Gashi had initialed each page. Also, the discrepancies between his application and documentary evidence and testimony also cast doubt on his credibility. Specifically, Gashi's conflicting recitations of the dates of his alleged incidents of persecution and failure to indicate initially that his mother also was murdered suggested that the story was incredible. Furthermore, Gashi's appearance in the photos presented cast doubt on his story. The BIA also believed that the evidence demonstrated that conditions in Kosovo had changed for the better since Gashi's incidents of persecution and that Gashi could have asked the government for help, since his party was in power.

Gashi filed a petition for review of the BIA's decision with this Court. We sua sponte dismissed the petition as untimely, pursuant to INA § 242(b)(1) and 8 U.S.C. § 1252(b)(1).

**b. First Motion to Reopen**

Gashi filed his first motion to reopen his removal proceedings based on new evidence and changed country conditions. The new evidence claimed by Gashi included: (1) a statement by his wife, requesting that Gashi be granted asylum because "he is in danger from [an] unknown person who keep asking my children when is your father coming home;" (2) a statement by two acquaintances from Gashi's village that Gashi was mistreated by Serbian police several times and abducted by members of the extremist Democratic Party; (3) a statement by Gashi's neighbor in his village that Gashi was forced to leave Kosovo for political reasons; and (4) a statement by his brothers-in-law that Gashi was "treated badly" by an unknown group and would be persecuted if he returned to Kosovo. Gashi explained that these statements previously were unavailable because he had lost contact with the affiants during the war.

The changed country conditions claimed by Gashi centered around the death of the LDK's president. He claimed that the former president's expected successor was known to be weak and ineffectual, such that Gashi had an increased reasonable fear of future persecution because the new president would not be able to control the opposition party. To this end, Gashi submitted: (1) an internet biography of the former president, explaining that he died on January 21, 2006; (2) a newspaper article, explaining that the former president's death created a "leadership vacuum at the most sensitive time since the Kosovo war ended in 1999;" and (3) a

newspaper article, explaining the identity of the former president's expected successor.

The BIA denied the motion to reopen, reasoning that Gashi had failed to demonstrate that the statements were unavailable at the time of his asylum hearing and that the contents of the statements did not demonstrate that the IJ's adverse credibility finding was clearly erroneous, as they were vague and did not contain enough detail to establish that Gashi's claims were true. The BIA also reasoned that the articles did not demonstrate sufficient changes in the conditions in Kosovo. Gashi filed a petition for review of the BIA's decision with this Court. See Gashi v. U.S. Att'y Gen., No. 06-12276 (11th Cir. Jan. 10, 2007). We dismissed the petition. See id. at manuscript op. at 2.

### c. Instant Motion to Reopen

Gashi filed this second motion to reopen his asylum proceedings based on new evidence and changed country conditions on August 27, 2007. Gashi also requested the BIA to sua sponte reopen his removal proceedings, pursuant to § 1003.2(a).

The new evidence claimed by Gashi included: (1) an affidavit of his wife, stating that Gashi was forced to leave her and their four children because he was threatened, maltreated, and put in danger of losing his life by supporters of other political parties wanting him to cease his activities with the LDK; (2) an affidavit

9

of a family friend with whom he lived in the United States, stating that Gashi was arrested, beaten, and threatened by Serbian police because of his political activity, that his father was killed by Serbian police, and that Gashi was forced to flee by "Albanian Groups" because he did not support the war; (3) an article dated January 7, 2003, about the murder of a leader of the Albanian forces for liberation, whom Gashi claimed was his relative; (4) a letter from a neighbor in the United States, stating that he had seen Gashi looking worried for his family's safety and that Gashi had told him about being beaten and arrested by Serbian police, his farther's murder by Serbian police during the war, and his persecution by groups who were angry that Gashi did not join the Albanians in fighting the Serbians during the war; (5) a letter from Gashi's brother-in-law, stating that Gashi was forced to flee Kosovo because "some Albanian Groups" persecuted him for not supporting the Kosovo Liberation Army in its fight against the Serbs and stating that Gashi was saddened by his father's murder; (6) a letter from a neighbor in the United States, stating that Gashi was threatened and persecuted by other Albanians because he did not help fight the Serbs and that Gashi was saddened by the murder of his father; and (7) a letter congratulating Gashi on being "randomly selected and registered for further consideration in the Diversity Immigrant Visa program for fiscal year 2008." Gashi explained that these letters provided "adequate explanation for the perceived inconsistencies in the record" and corroborated his story.

10

The changed country conditions claimed by Gashi centered around the continued struggle for the independence of Kosovo. To this end, Gashi submitted: (1) the U.S. Department of State Serbia and Montenegro Country Report on Human Rights Practices for 2006, stating that corruption and impunity in the police forces were problems, politically and ethnically motived killings were problems in Kosovo, society viewed Serbs with "antipathy," local security forces authorized by Kosovo's provisional government committed at least one unlawful or arbitrary killing in 2006, and the 2005 politically motivated killings of several Kosovo Albanians remained unresolved. Gashi also submitted newspaper articles explaining that: (2) ethnic Albanians in Kosovo were impatient for independence and had "warned of violent unrest if [they saw] their demand for independence denied, or significantly delayed;" (3) the Serbian Prime Minister had expressed displeasure with the United States's support of Kosovo independence; (4) U.S. President Bush made statements supporting Kosovo independence and indicating that "time [was] up;" (4) a vote on a "Kosovo resolution" was expected in the fall of 2007 and Kosovo Albanian leaders had planned a "decisive diplomatic offensive aimed at securing the adoption of [the] resolution;" (5) Russia was planning on vetoing an international agreement on Kosovo and delays had caused "increased frustration" in Kosovo; (6) the "potential for inter-Albanian violence in Kosovo . . . was becoming more and more likely as the rival Kosovo Albanian politicians"

11

consolidated their power and divisions among the Kosovo Albanians could cause a "blow up in any time;" (7) "achieving a just and stable solution to Kosovo [was] like a long and complicated waltz on a dance floor full of holes, with clumsy dancers and the occasion oil slick;" (8) the international community's delay in resolving the Kosovo issue could engender a sense of grievance in Albanians which could prove corrosive and supportive of radical Islam; (9) the Serbian president would not accept Kosovo independence; (10) the international community was putting pressure on Serbia to accept a resolution on the issue; (11) the practice of radical Islam was feared to be growing in Serbia; (12) an Islamic charity was being run in Kosovo; (13) Kosovo had been described as a "criminalized state;" (14) blasts had detonated near Serbian monasteries in Kosovo and that other violence against Christian Serbs and their holy sites had occurred; (15) Serbian Christians living in Kosovo feared being wiped out if Kosovo achieved independence; (16) the Kosovo government was unable to prevent or control violence; (17) Serbian minorities had been persecuted; (18) religious animosity was widespread among Kosovo's citizens; (19) two people were killed in clashes between police and ethnic Albanian protesters on February 10, 2007; (20) a leader in the creation of a Kosovo resolution believed that peace could not prevail during his lifetime; (21) a Serbian bus was attacked; (22) some people were concerned that an "imposed solution" could exacerbate the "already heightened

tensions within Kosovo" and could lead to further violence; (23) the Albanian/Serb impasse was a "very serious political crisis;" (24) those who committed war crimes in Kosovo had yet to be brought to justice; (25) in March 2004, 50,000 people in Kosovo rioted in the streets and Kosovo's minorities bore the brunt of the violence, which left close to 24 people dead; and (26) the progress in Kosovo was slow; and (27) Albanian "terror groups" targeted both United Nations troops and Serbs. Gashi further submitted (28) "The Kosovo Report," outlining the history of the Kosovo conflict.

The BIA denied the motion to reopen, reasoning that it was both time and number barred and that none of the letters or articles provided the type of information necessary to overcome this numerical or temporal restriction. The BIA also reasoned that the new evidence did not demonstrate that the IJ's adverse credibility finding was clearly erroneous. The BIA also declined to exercise its sua sponte discretion to reopen the case.

## II. Law & Analysis

### a. Denial of Asylum, Withholding of Removal, and CAT relief

Pursuant to 8 U.S.C. § 1252(a)(1) and (b)(1), a petitioner has 30 days from the date of the final order of removal to file his petition for review of that order with this Court. We have held that the 30-day deadline is "mandatory and

13

jurisdictional" and "is not suspended or tolled by" the filing of a motion to reopen. Dakane v. U.S. Att'y Gen., 371 F.3d 771, 773 n.3 (11th Cir. 2004).

The instant motion was not timely as to the underlying denial of relief. See 8 U.S.C. § 1252(a)(1), (b)(1). Gashi's final order of removal was filed on November 15, 2005. Gashi did not file the instant motion to reopen until August 27, 2007. Because the instant motion was filed more than 30 days after the order of removal, we lack jurisdiction to consider the BIA's denial of asylum, withholding of removal, or CAT relief, or the attendant adverse credibility finding. See 8 U.S.C. § 1252(a)(1) and (b)(1); Dakane, 371 F.3d at 773 n.3. Accordingly, we dismiss the petition as to this matter.

### b. Motion to Reopen

We review the denial of a motion to reopen for an abuse of discretion. Anin v. Reno, 188 F.3d 1273, 1276 (11th Cir. 1999). This judicial review is limited to determining "whether there has been an exercise of administrative discretion and whether the matter of exercise has been arbitrary or capricious." Garcia-Mir v. Smith, 766 F.2d 1478, 1490 (11th Cir. 1985) (quotation omitted).

An alien may move the BIA to reopen a prior removal order based on new evidence. See 8 C.F.R. § 1003.2(a) and (c)(1); see also 8 U.S.C. § 1229a(c)(7)(C)(ii); INA § 240(c)(7)(C)(ii). The alien may file only one such motion to reopen and that motion must be filed no later than 90 days after the date

on which the final administrative decision was rendered in the proceeding sought to be reopened. 8 C.F.R. § 1003.2(c)(2); 8 U.S.C. § 1229a(c)(6)(A) and (C)(i); INA § 240(c)(6)(A) and (C)(i). We have held that this 90-day requirement is "mandatory and jurisdictional, and, therefore, it is not subject to equitable tolling." Abdi v. U.S. Att'y Gen., 430 F.3d 1148, 1150 (11th Cir. 2005). An exception to the 1-motion limitation and 90-day deadline exists, however, if the motion to reopen is for the purpose of reapplying for relief "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii); 8 U.S.C. § 1229a(c)(7)(C)(ii); INA § 240(c)(7)(C)(ii).

Regarding the "material" element of the exception, we have explained that an alien who attempts to show that evidence is material to his removal proceedings "bears a 'heavy burden,' and must 'present[] evidence of such a nature that the [BIA] is satisfied that if proceedings before the [IJ] were reopened, with all attendant delays, the new evidence offered would likely change the result in the case.'" Ali v. U.S. Att'y Gen., 443 F.3d 804, 813 (11th Cir. 2006) (holding that the BIA did not err in putting the burden of proof to demonstrate grounds for granting a motion to reopen on the alien).

15

The instant motion is both time- and number-barred.  See 8 C.F.R. § 1003.2(c)(2); 8 U.S.C. § 1229a(c)(6)(A) and (C)(i); INA § 240(c)(6)(A) and (C)(i).  It is undisputed that the instant motion to reopen is at least temporally barred.  The point in dispute is whether the evidence submitted with the motion demonstrates changed country conditions in Kosovo and is material.  See 8 C.F.R. § 1003.2(c)(3)(ii); 8 U.S.C. § 1229a(c)(7)(C)(ii); INA § 240(c)(7)(C)(ii).

The affidavits and other documents submitted by Gashi do not demonstrate changed conditions in Kosovo.  See 8 C.F.R. § 1003.2(c)(3)(ii); 8 U.S.C. § 1229a(c)(7)(C)(ii); INA § 240(c)(7)(C)(ii).  The affidavits and letters submitted all speak to the past, such that they have no bearing on the changed-country-conditions issue.  Also, the article on the death of an alleged relative of Gashi's and the letter congratulating him on his selection for the Diversity Immigrant Visa program do not point to any changes in Kosovo.  As such, these documents do not provide any ground for the relief sought.  See 8 C.F.R. § 1003.2(c)(3)(ii); 8 U.S.C. § 1229a(c)(7)(C)(ii); INA § 240(c)(7)(C)(ii).

The articles and Country Report submitted by Gashi are not material.  See 8 C.F.R. § 1003.2(c)(3)(ii); 8 U.S.C. § 1229a(c)(7)(C)(ii); INA § 240(c)(7)(C)(ii).[1]

---

[1] While we note that the articles and Country Report may demonstrate changed country conditions, as they point out that Kosovo Albanians were becoming increasingly impatient with the slow progress toward independence and that the situation likely was fast approaching its head, we find it unnecessary to determine whether the materials satisfied this portion of the standard because we find that the materials were immaterial, as discussed below.  See 8 C.F.R.

16

Given the facts of this case, in order to satisfy the materiality requirement, the articles and Country Report must provide information that likely would lead the IJ, first, to find Gashi credible and, then, to find that Gashi demonstrated a well-founded fear of future persecution or that the odds of him suffering future persecution or torture were more likely than not. See Ali, 443 F.3d at 813.

Regarding Gashi's credibility, none of these documents speak to the believability of Gashi's story. The IJ found that Gashi was not credible because of questions of when he became a member of the LDK, given his appearance in his LDK-membership-card photograph; Gashi's inconsistency concerning the dates of his alleged incidents of persecution; and the perceived change in Gashi's story over the murders of his parents and his failure to present death certificates for his parents. None of the documents are relevant to these points or provide any reason for the IJ to overlook these perceived flaws in Gashi's credibility. Thus, the evidence submitted is not material to the IJ's credibility finding. See Ali, 443 F.3d at 813. Because Gashi failed to meet his high burden on this point, the question of whether the documents show past persecution or a well-founded fear of future persecution is moot. See id. As such, these documents do not provide any ground for the relief sought. See 8 C.F.R. § 1003.2(c)(3)(ii); 8 U.S.C.

_____

§ 1003.2(c)(3)(ii); 8 U.S.C. § 1229a(c)(7)(C)(ii); INA § 240(c)(7)(C)(ii)

§ 1229a(c)(7)(C)(ii); INA § 240(c)(7)(C)(ii). Accordingly, we deny the petition as to this matter.

### c. Request to Sua Sponte Reopen

Under 8 C.F.R. § 1003.2(a), the BIA may reopen proceedings in a case in which it has rendered a decision at any time upon its own motion. We have held that 8 C.F.R. § 1003.2 "reposes very broad discretion in the BIA 'to reopen or reconsider' any motion it has rendered at any time or, on the other hand, '[to] deny a motion to reopen.'" Anin, 188 F.3d at 1279 (construing 8 C.F.R. § 3.2, which is substantively identical to 8 C.F.R. § 1003.2). We explained further that:

> The discretion accorded in this provision is so wide that even if the party moving has made out a prima facie case for relief, the BIA can deny a motion to reopen a deportation order. No language in the provision requires the BIA to reopen a deportation proceeding under any set of particular circumstances. Instead, the provision merely provides the BIA the discretion to reopen immigration proceedings as it sees fit. Federal circuit courts consistently have interpreted the provision in this way. They have read 8 C.F.R. § 3.2(a) to give the BIA the discretion to reopen immigration proceedings in situations where federal courts lack the legal authority to mandate reopening.

Id. (quotations and citations omitted). We ultimately held that "[i]n short, the provision gives the BIA non-reviewable discretion," such that "[it] could find no abuse of discretion [in Anin]. Id.

We do not have jurisdiction to review the BIA's decision not to sua sponte reopen Gashi's proceedings. See id. The BIA expressly declined to reopen

18

Gashi's removal order <u>sua sponte</u>.  Regardless of whether the  BIA's conclusions were correct, its discretion to refuse to reopen the case <u>sua sponte</u> was so broad as to be non-reviewable.  <u>See</u> <u>id.</u>  Accordingly, we dismiss the petition as to this matter.

**PETITION DENIED IN PART, DISMISSED IN PART.**